FILED
2013 MAY 7 P 12:36
CLERK
U.S. BANKRUPTCY
COURT - PGH

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| MARY V. CARPENTER, | : | Case No. 11-20896-TPA |
| *Debtor* | : | Chapter 13 |
| | | |
| MARY V. CARPENTER, | : | |
| *Plaintiff* | : | Adv. No. 11-2252-TPA |
| | : | |
| v. | : | Related to Doc. No.  78 |
| | : | |
| US BANK, N.A. and FIVE BROTHERS: | | |
| MORTGAGE COMPANY SERVICES | : | |
| AND SECURING, INC. and | : | |
| SAFEGUARD PROPERTIES, LLC | : | |
| *Defendant* | : | |

*Appearances:*  Gary W. Short, Esq., for the Plaintiff, Mary V. Carpenter
Scott M. Hare, Esq., for the Defendant, U.S. Bank, N.A.
George A. Miller, Esq., for the Defendant, Five Brothers Mortgage Company
          Services and Securing, Inc.
Joseph J. Santoro, Esq., for the Defendant, Safeguard Properties, LLC

**MEMORANDUM OPINION**

Before the Court for decision is the ***Motion to Dismiss*** ("Motion") the *Second*

*Amended Complaint* [1] ("SAC") filed by Defendant Safeguard Properties, LLC ("Safeguard") at Doc.

No. 78. The *Motion* argues that all of the eight counts in the SAC naming Safeguard as a defendant

---

[1]        The pleading at issue in the *Motion* was mistitled by the Debtor  as "Adversary Complaint."
See Doc. No. 75.  It is actually the second amended complaint (see the previous two versions of the initial
pleading at Doc. Nos. 1 and 34).  To avoid any possible confusion caused by the mistitle, the Court will refer
to the pleading at issue as the Second Amended Complaint or "SAC" in this *Memorandum Opinion* and in
the accompanying *Order.*

should be dismissed pursuant to *Fed.R.Civ.P. 12(b)(1)* (lack of subject matter jurisdiction) and/or

*Fed.R.Civ.P. 12(b)(6)* (failure to state a claim upon which relief may be granted).[2]   The *Motion* has

been fully briefed and argued.   For the reasons set forth below, the *Motion* will be granted in part,

and Counts II and VI  of the SAC will be dismissed as against Safeguard.   Count VIII of the SAC

will also be dismissed as against Safeguard, but the effect of that dismissal will be delayed for 30

days to give the Debtor a chance to rectify its deficiencies.   The *Motion* will be denied in all other

respects, and Safeguard will be directed to file its answer.


## APPLICABLE STANDARD


A motion to dismiss under *Rule 12(b)(1)* challenges the court's subject matter

jurisdiction:

> "At issue in a *Rule 12(b)(1)* motion is the court's 'very power to
> hear the case.' " *Petruska v. Gannon University*, 462 F.3d 294, 302 (3d
> Cir.2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d
> 884, 891 (3d Cir.1977)). When jurisdiction is challenged under *Rule
> 12(b)(1)*, the plaintiff bears the burden of proving that the court has
> jurisdiction. See *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir.2005)
> (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d
> Cir.1991)). If the court concludes that it does not have subject matter
> jurisdiction over the case, it must dismiss the action. *Fed.R.Civ.P. 12(h) (3)*.

*Beeman v. United States*, 2013 WL 1314467 *1 (W.D. Pa. March 28, 2013)


The standard to be applied in deciding a motion to dismiss under *Rule 12(b)(6)* is

more complex.   The late Chief  Judge Lancaster of the District Court recently explained the

approach to be followed:

---

[2]    These *Rules* are incorporated into bankruptcy procedure pursuant to *Fed.R.Bankr.P. 7012(b)*.

In considering a *Rule 12(b)(6)* motion, we must be mindful that federal courts require notice pleading, as opposed to the heightened standard of fact pleading. Federal Rule of Civil Procedure 8(a)(2) requires only " 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds on which it rests.' " *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

To survive a motion to dismiss, a complaint must contain sufficient facts that, if accepted as true, state "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when a plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. However, the court is " 'not bound to accept as true a legal conclusion couched as a factual allegation.' " Id. (quoting *Twombly*, 550 U.S. at 555).

Therefore, when deciding a motion to dismiss under Rule 12(b)(6), we must conduct a three-step inquiry. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir.2010). First, we must " 'tak[e] note of the elements a plaintiff must plead to state a claim.' " Id. (quoting *Iqbal*, 556 U.S. at 675). Next, we must identify the allegations that "are no more than conclusions [and] are not entitled to the assumption of truth." Id.; *Iqbal*, 556 U.S. at 679. Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." Id. (internal quotation omitted).

We may not dismiss a complaint merely because it appears unlikely or improbable that plaintiff can prove the facts alleged or ultimately prevail on the merits. *Twombly*, 550 U.S. at 563 n. 8. Instead, we must ask whether the facts alleged raise a reasonable expectation that discovery will reveal evidence of the necessary elements. Id. at 556. In the end, if, in view of the facts alleged, it can be reasonably conceived that the plaintiff could, upon a trial, establish a case that would entitle him to relief, the motion to dismiss should not be granted. Id. at 563 n. 8.

In deciding a *Rule 12(b)(6)* motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon these documents. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir.2010); *Fed.R.Civ.P. 10(c)* ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

*Merrill v. State Farm Fire & Casualty Co.*, 2013 WL 588515 *2-3 (W.D. Pa. February 13, 2013).

## FACTUAL ALLEGATIONS

The basic facts as alleged in the SAC, accepted as true for purposes of deciding the *Motion*, are not complicated. In 1989 the Debtor executed a mortgage on her residence, property located at 2607 South Braddock Avenue in Pittsburgh (hereinafter, "the Real Property" or "the Residence"). SAC at ¶6. At some point thereafter, the mortgage was assigned to Defendant U.S. Bank, N.A. ("Bank"). The Debtor fell behind on her mortgage payments in 2010 and on September 7, 2010 the Bank sent her a notice of intention to foreclose, pursuant to the requirement of *41 P.S. §403*, commonly known as an Act 6 notice. SAC at ¶7. Thereafter, but before a foreclosure action was commenced, the Bank employed a process server to determine whether the Debtor was residing at the Real Property. SAC at ¶8. He reported that the Debtor was receiving mail at the Real Property, including tax bills, although the phone line had been disconnected.[3] SAC Exhibit 3.

The Bank also employed Safeguard and the remaining Defendant, Five Brothers Mortgage Company Services and Securing, Inc. ("Five Brothers"), to assist with the planned foreclosure. In late December 2010, or early January 2011, while the Debtor was at work, representatives of Safeguard and Five Brothers "broke into" the Real Property and changed the locks. SAC at ¶9. All of the personal property therein, including furniture, clothing and family memorabilia which belonged to the Debtor and her two children, was removed from the Residence

---

[3]    Lest the Debtor be placed under any misapprehension, the Court wishes to make clear that it is assuming she was actually living at the Residence in the time period leading up to and including the events complained of solely for the sake of deciding the *Motion*, and in keeping with the requirement to view the factual allegations in the light most favorable to her. The mere fact that she was receiving mail at the Residence, while some evidence of her residing there, may not be sufficient of itself to carry the day if the issue is placed in dispute at trial.

and taken away in four trucks.[4]  SAC at ¶¶9, 10. In addition, a vehicle and a motorcycle were removed from the premises.  SAC at ¶9.  A notice was left on the back door with Five Brothers' name and a telephone number to call.  *Id.*  At approximately 8:30 P.M. that same day, the Debtor arrived at the Residence and discovered that she was locked out. SAC at ¶11.   She called the Five Brothers telephone number but got a recording.  *Id.*   Being locked out of the Residence, she spent the night at her sister's home.  *Id.*

The next day, the Debtor had several telephone conversations with Five Brothers and the Bank.  She was told there had been a mistake and was given an "access code" for the lock box that had been placed on the door, and she was thus able to get into the Residence at that point.  SAC at ¶13.  The Debtor was also told that she should make a list of the missing personal property and it would be returned.  *Id.*  The Bank filed a foreclosure action in the Allegheny County Court of Common Pleas on January 11, 2011.  SAC at ¶14.  A few days later, the Debtor got a call from Five Brothers to make arrangements for the return of her car.  Shortly after that, the car, the motorcycle, two boxes of items, a television,[5] and a table and chair set were returned.  The Debtor asked the person who returned these items what had happened to the rest of her personal property and was told that he did not know.  SAC at ¶15.

---

[4]       Attached to the SAC as Exhibit 4 is a 6-page document which the Debtor describes as a "partial list" of the missing property.

[5]       Although not expressly stated in the SAC, the two boxes and television that were returned were then  apparently left at the Residence because the Debtor alleges she returned there on March 10, 2011, and found them to again be missing.  SAC at ¶16.  The Debtor acknowledged at oral argument on the *Motion* that she has no evidence that any of the Defendants  took these items a second time, but asks the Court to draw that inference because they continued to have access to the Residence at that time by way of the lockbox that had been placed on it.

The Debtor has not lived at the Residence since the removal of her personal property, she says initially that was due to the lack of furniture, with some vandalism that was done to the Residence later adding a further reason for absenting herself from it.  She has instead been living elsewhere, while continuing to pay for the utilities on the Property.  The Debtor filed her bankruptcy petition on February 18, 2011, and the within adversary proceeding was filed on May 17, 2011.  Only the Bank and Five Brothers were originally named as Defendants.  Safeguard was added as a Defendant only in the SAC.

## DISCUSSION

The SAC contains ten Counts, but only the first eight name Safeguard as a Defendant.  Counts I through III are causes of action under the Bankruptcy Code, while Counts IV through VIII are state common law tort claims.  There is no dispute that these state law claims are governed by Pennsylvania law, and as to them, the Debtor asserts the Court has jurisdiction on the basis of diversity of citizenship under *28 U.S.C. §1332.*  The Court will discuss the *Motion* below with respect to each of the eight Counts.

### *(1)   Count I – Turnover of Personal Property*

The Debtor brings Count I pursuant to *11 U.S.C. §542(a),* which provides in relevant part:

> ...an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property

or the value of such property, unless such property is of inconsequential
value or benefit to the estate.

*11 U.S.C. §542(a).*   Safeguard argues that Count I of the SAC fails to adequately allege that
Safeguard had possession of the personal property to state a claim under this provision.

As a starting point, the Court must determine *when* the Defendants were required to
have had possession of estate property for a claim of turnover to be  stated under *Section 542(a)*.
There is not a unanimous view among the courts on this point.  Some courts, viewing a turnover
action as essentially an *in rem* proceeding,  require the plaintiff to show that the defendant had
possession of the property at the time the turnover action adversary proceeding was filed.  *See, e.g.*,
*Hager v. Gibson*, 109 F.3d 201 (4th Cir. 1997).  However, other courts, relying upon the statutory
language  of the "property or the value of such property," permit a turnover action to be brought
against a defendant who held property belonging to the debtor at any time after  the bankruptcy case
was filed, whether or not the defendant still possessed the property at the time the turnover action
itself was brought.  *See, e.g.*,  *Matter of USA Diversified Products, Inc,* 100 F.3d 53 (7th Cir. 1996).
The Parties have not pointed to any binding authority from the Third Circuit on this issue.  The
Court finds that, for purposes of deciding the *Motion*, the  best course is to assume application of
the broader view, without necessarily thereby deciding the issue conclusively.  *See*, *In re Mushroom
Transp. Co. , Inc.*, 366 B.R. 414, 439 (Bankr. E.D. Pa. 2007);  *Horne v. Farrell*, 560 F.Supp. 219,
227 (M.D. Pa. 1983) (where unsettled state of law made it unclear whether plaintiff had stated a
cause of action, motion to dismiss would be denied).  Thus, the SAC will be  sufficient to withstand
the *Motion* as to Count I if it can be read to allege that Safeguard had possession of any of the
Debtor's personal property at any time since the filing of  the bankruptcy case.

7

In that regard, the Debtor concedes that the SAC does not make an explicit allegation to that effect.   The SAC alleges the personal property was taken from the Residence by representatives of Five Brothers and Safeguard in late December 2010 or early January 2011 and loaded into trucks.  SAC at ¶9-10.  Although some of that property was subsequently returned to the Debtor, much of it was never returned, those items being detailed in the SAC at ¶15 and Exhibit 4. Assuming the allegations in the SAC to be true for purposes of the *Motion*, it is clear that this missing property was in the possession of Five Brothers and Safeguard as of the time it was removed from the Residence, and its whereabouts thereafter are not known by the Debtor.  The Debtor argues that a natural inference from the allegations that are made would be that those Defendants continued to have actual or constructive possession or control over the property as of the time the bankruptcy petition was filed, which was less than two months later.

Safeguard counters by arguing that the fact that only some of the personal property was returned to Debtor should lead to the inference that the returned property was the only property of the Debtor still in the possession of Five Brothers/Safeguard at the time of the return.  In other words,  Safeguard appears to be suggesting that  the Court draw the inference that the remaining personal property had already been disposed of by that time.  *See Safeguard Response* at 2-3.

In deciding the *Motion*, the Court is required to draw all inferences in the SAC in the light most favorable to the Debtor.  *See*, *Torres v. Davis*, 2012 WL 6019090 *2 (3d Cir. 2012).  The mere fact that only some of the personal property was returned does not, in the Court's view, compel a conclusion that the remaining property was no longer in the possession or control of Five Brothers/Safeguard.  The Court notes that  the SAC alleges that when the Debtor asked the Five

8

Brothers representative who returned some of the property about the still-missing property, she was only told "he did not know anything about that." SAC at ¶15.  Had the Debtor been told the property had already been disposed of at that time, perhaps the Debtor's proposed inference would not be reasonable.  That did not happen, however, and, in short, the inference which the Debtor seeks the Court to draw is thus a reasonable one, and is at least as plausible as the inference suggested by Safeguard. The Court therefore adopts this as an inference drawn from the facts as alleged, and finds that Count I survives the *Motion*.[6]

### (2)   *Count II – Turnover of Real Property*

The Debtor is in a far weaker position as to Count II.  The Court  agrees that the initial action of entering the Residence and changing the locks on it was a taking of possession and control of the Real Property by Safeguard, and a concomitant deprivation of the Debtor's possession and control.  That status was swiftly changed the very next day, however,  when the Debtor was given the access code that allowed her to gain entry to the Residence.  At the very least, the Debtor had joint possession of the Real Property from that time forward, or in other words, from well before the filing of her bankruptcy petition.

In fact, the allegations in the SAC lead the Court to conclude that the Debtor effectively had regained exclusive possession and control of the Real Property within a day of the

---

[6]     The Court could direct the Debtor to file a third amended complaint to expressly allege, upon information and belief, that the property in question was in the possession or control of Safeguard when the bankruptcy was filed.  However, the Debtor, through no fault of her own,  does not know for sure what happened to the missing property and is clearly relying on the inference that the property remained in the possession and control of the last parties known to have had it.  Requiring an amendment in these circumstances would elevate form over substance.

wrongful entry.  There is no allegation that Safeguard or the other Defendants ever returned to the

Real Property thereafter (except to return some of the personal property to the Debtor).  Moreover,

once she was given the access code,  the Debtor was certainly in a position to have the locks

changed again on the Residence had she wanted to ensure the Defendants' exclusion from it.  While

this would have been an expense to her, she could have recovered it as damages, as indeed she has

pled it as an anticipatory damage in Paragraph 19(c) of the SAC.  In the absence of an allegation that

the Debtor could not afford to have the locks changed, or that she was somehow otherwise prevented

from doing so, the Court must  view her failure to do so as a voluntary choice not to take an easy

step  that would have obviated any question about her exclusive possession and control of the

Residence.

The Debtor argues that because the Residence was empty once the personal property

had been taken, that rendered it uninhabitable, such that she could not live in it and therefore did not

have possession.  The Court cannot accept that argument.  Nothing that any of the Defendants did

made the Residence "uninhabitable" as that term is understood in the law.  *See, e.g., Velez v.

Cisneros*, 850 F. Supp. 1257 (E.D. Pa. 1994) (habitability is a legal term of art meaning that the

premises are free from serious defects to health and safety); *Pugh v. Holmes*, 405 A.2d 897, 905 (Pa.

1979) (in context of implied warranty of habitability, defect must be of a nature and kind which will

prevent the use of the dwelling for its intended purpose to provide premises fit for habitation by its

dwellers.)  There is absolutely no indication that the Residence was uninhabitable in the legal sense

after the personal property was removed.  The fact that the Debtor voluntarily chose to stay

elsewhere cannot be equated to a lack of possession on her part for purposes of this turnover action.

Count II must therefore be dismissed for failure to state a claim upon which relief can be granted.

10

### (3)   Count III – Violation of Automatic Stay

The Parties agreed that Count III is entirely dependent on the viability of Counts I and II in that the improper continued retention of any of the Debtor's property after the bankruptcy filing would also be a violation of the automatic stay, and remediable under *11 U.S.C. §362(k)*. Since Count I, as to turnover of personal property, will remain part of the case, the *Motion* must be denied as to Count III.  It should be recognized, however, that a violation of the automatic stay based on continued possession of the Real Property is precluded as a result of the dismissal of Count II discussed immediately above, and this will be noted in the accompanying Order on the *Motion*.

### (4)   Count IV - Conversion; Count V-trespass

Because these two Counts are similar and elicited similar objections by Safeguard, they will be treated together.  Safeguard originally raised two grounds under *Rule 12(b)(1)* for the dismissal of the conversion claim in Count IV and the trespass claim in Count V.  First, Safeguard argued that the Court lacks the subject matter jurisdiction to make a final decision on the claims in those Counts based on the decision in *Stern v. Marshall*, __ U.S. __, 131 S.Ct. 2594 (2011).  That ground has now been rendered moot because the District Court has directed that this Court will only preside over  the case through the pretrial process, with the case to then be transferred to the District Court for trial and decision.  *See, Memorandum and Order of November 30, 2012*, Doc. No. 5  in *Carpenter v. U.S. Bank, N.A., et. al.* #2:12-cv-00021-GL.  Safeguard also raised a *Stern* issue with respect to the remaining Counts VI through VIII, and those are likewise moot as well for the same reason and will not be discussed further.

Safeguard's second argument under *Rule 12(b)(1)* is a challenge to whether diversity jurisdiction exists to hear these state law claims.[7]  Pursuant to *28 U.S.C. §1332(a)(1)*, district courts have diversity jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  There is apparently no dispute that the second, or diversity,  condition is met since the Debtor is a citizen of Pennsylvania, while Safeguard was incorporated in Delaware and has its principal place of business in Ohio.  *See* SAC at ¶¶1, 4.[8]  Safeguard contends, however,  that the first condition is not met because the SAC does not contain sufficient allegations to meet the $75,000 amount in controversy requirement.

Safeguard argues that although the Debtor has alleged total damages of $222,117.60, only $72,117.60 of those are  compensatory damages, the balance consisting of  anticipated punitive damages.  Safeguard acknowledges that a calculation for punitive damages may be included in determining the amount in controversy, but only when the allegations of punitive damages are made in good faith and when state law would permit recovery of such damages.  Safeguard argues that the Debtor cannot meet that standard here because the SAC lacks an  allegation of malicious, wanton, reckless, willful, or oppressive conduct sufficient to support an award of punitive damages.

---

[7]  The Court notes that the SAC did not plead supplemental jurisdiction under *28 U.S.C. §1367(a)* as an alternative basis for subject matter jurisdiction of the state law claims in Counts IV through VIII.  Since these state law claims and the allowed federal question claims in Counts I and III appear to derive from a "common nucleus of operative facts", and might ordinarily be expected to be tried in one judicial proceeding, supplemental jurisdiction might exist.  *See*, *MCI Telecomms. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1102 (3d Cir. 1995).  In any event, given the Court's conclusion as to diversity jurisdiction, it has not considered supplemental jurisdiction as an alternative.

[8]  The other two Defendants were also incorporated in and have their principal place of business in states other than Pennsylvania.

Safeguard also points out that the Debtor has variously valued her missing personal property as $15,000 (SAC at ¶19(a)), $44,126 (SAC at Exhibit 4), and $1,090 (original bankruptcy petition Schedule B). Safeguard argues that the doctrine of judicial estoppel prevents the Debtor from contradicting the valuation of $1,090. It notes that under Supreme Court precedent the Debtor would be very unlikely to ever get more than ten times that amount in punitive damages because of Constitutional due process concerns, leaving her well below the $75,000 threshold. *See*, *BMW of North Am., Inc. v. Gore*, 517 U.S. 559 (1996).

The Debtor counters by arguing that, unless it appears to a legal certainty that she cannot recover it, the amount she claims in the SAC controls for purposes of diversity jurisdiction when considering the *Motion*. She argues that compensatory damages of over $71,000 have been alleged, meaning she only need recover punitive damages of $3,182.41 or more to exceed the diversity amount. She argues that under Pennsylvania law punitive damages are potentially awardable in any intentional tort action, including conversion and trespass. As to the Safeguard argument that she is bound by the $1,090 figure in her original Schedule B, Debtor correctly points out that Safeguard ignores the fact that the same Schedule also showed a claim of $150,000 against the Bank and its agents for conversion, which claim would include the value of the missing property within it, and that in any event she filed an Amended Schedule B on March 7, 2012, in which she claimed a value of $15,000 in the missing property and increased the value of the claim against the Bank and its agents to $185,293.

When the diversity jurisdiction of a court is challenged in a motion to dismiss, the court must apply the "legal certainty" test. As stated by the Third Circuit:

13

> In determining whether the amount in controversy exceeds $75,000, the Court generally accepts the plaintiff's good faith allegations... However, the case may be dismissed for failure to meet the amount in controversy requirement if it appears to a "legal certainty" that the claim is for less than the jurisdictional amount ... It necessarily follows that whether the claims are for less than the jurisdictional amount depends on what damages a plaintiff could conceivably recover under state law .... When punitive damages are recoverable, they are properly considered in determining whether the jurisdictional amount has been satisfied ... but when a claim for punitive damages is frivolous, "such damages are unavailable as a matter of law" and "that claim must be stricken from the amount in controversy."

*Onyiuke v. Cheap Tickets, Inc.*, 435 Fed. Appx. 137, 139 (3d Cir. 2011) (citations omitted). One way of restating this legal certainty test is that a complaint will be dismissed for failure to meet the amount in controversy requirement only if the court finds that no reasonable jury could award that amount. 14AA C. Wright and A. Miller, *Federal Practice and Procedure, Jurisdiction* §3702 (4th Ed. 2012). The sum claimed by the plaintiff generally controls if the claim is "apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938). The question whether a plaintiff's claims pass the legal certainty standard is a threshold matter that should involve the Court in only "minimal scrutiny" of the claims. *Suber v. Chrysler Corp.*, 104 F.3d 578, 583 (3d Cir. 1997).

When that standard is applied here, the Court concludes that it cannot be demonstrated to a legal certainty at this time that the Debtor will not recover $75,000 or more on her conversion claim. To start with, the Court rejects Safeguard's argument that the Debtor is bound by the principle of judicial estoppel to a value of only $1,090 for the missing personal property. That argument is based on a selective, and somewhat disingenuous, reading of the original Schedule B filed by the Debtor. Although the Debtor did list only $1,090 in tangible personal property on

14

Schedule B, she also showed in Item (35) ("Other personal property of any kind") a claim of $150,000 against U.S. Bank and its agents for conversion, trespass, etc.[9]  The Court has no difficulty finding that the value of the removed and missing personal property itself was intended to be encompassed within the overall $150,000 amount claimed.  Furthermore, when the Debtor amended her Schedule B on March 7, 2012, she increased the amount shown as "furnishings" from $20 to $15,000, with an accompanying Appendix "A" making clear that the new amount represented the fair market value of the personal property that was taken.  The $15,000 figure also matches the amount alleged in the SAC at  ¶19(a) for the property loss.

The diversity jurisdiction/amount in controversy analysis therefore starts from a basis that the Debtor will be able to show a loss of $15,000 for the personal property that was taken and not returned, which would be a bare minimum of recoverable damages for the state law tort claims.[10]  But, the Debtor has alleged other damages as well, *see* SAC at ¶¶19(b)-(k).  For purposes of determining if the diversity threshold is met, some of these damages can clearly be added to the base amount of $15,000 representing the value of the missing property.  These would include damages for a necessary window repair ($250), lock replacement ($250) and motorcycle repair ($300).  The Debtor also claims damages for the loss of use of her residence for approximately 24 months and

[9]     At argument the Debtor explained that at the time of the original filing, she believed that because she no longer possessed the missing property she could not claim it directly on Schedule B but was required to make it part of her conversion claim.

[10]     Although it should not be necessary to say so, the Court notes that it has by no means concluded that the Debtor will ultimately succeed on this or any of her claims.  The Court's analysis is based on accepting the allegations in the SAC as true and drawing all reasonable inferences in a light most favorable to the Debtor.

15

the expense of maintaining another place to live during that same period.  The Court is less certain that these amounts ($867.40 and $500 respectively, per month) would be recoverable, but it does seem likely that at least something for damages for inconvenience could be recovered if the Debtor succeeds on her claim.  A cautious estimate of $200 per month adds $4,800 to the compensatory damage amount.

The Debtor also seeks damages for anguish and humiliation arising from the entry into her house and the removal of her personal property.  It appears that such damages may well be available here.  *See, e.g., Little v. York County Earned Income Tax Bureau*, 481 A.2d 1194, 1201-02 (Pa. Super. 2004) (citing with approval *Restatement (2d) Torts §905, Comment d*, to the effect that one who has a cause of action for tort may be entitled to recover for the form of mental distress known as humiliation as an element of damages.[11]  This same Restatement provision, at *Comment e*, provides that "fear and anxiety" may also be a proper item of damages, for example, for someone who has been tortuously and wantonly evicted from her home and worries for several hours about securing shelter.

Given the facts as alleged in the SAC, and the likely availability of damages for humiliation and anxiety if the Debtor proves her case, the Court will "estimate" a value of $7,500 for such damages for purposes of determining whether diversity jurisdiction exists.

---

[11]     The comment further notes that the state of mind of humiliation may come from the deliberate trespass to land or destruction or dispossession of chattels.  In fact, "Illustration 5" set forth in *Comment d* is a fair approximation of what the Debtor alleges happened to her: "A wantonly dispossesses B of household furniture to the knowledge of B's neighbors.  B is entitled to damage for humiliation." *Restatement (2d) Torts, §905, Comment d.*

16

To sum up, while taking a very conservative approach to the estimation of reasonable damage claim in the aggregate, the Court has little difficulty in finding a minimum of $28,100 in compensatory damages to be in dispute in this matter.  That, of course, is still short of the $75,000 statutory threshold for diversity jurisdiction.  But the Court has yet to consider the possibility of punitive damages and it now turns to that subject.

In *Golden ex. rel. Golden v. Golden*, 382 F.3d 348 (3d Cir. 2004) the court held that claims for punitive damages may be aggregated with claims for compensatory damages to meet the amount in controversy threshold unless the punitive damage claims are patently frivolous and without foundation.  *Id.* at 355.  Punitive damage claims are *per se* "patently frivolous and without foundation" if they are unavailable as a matter of state substantive law.  *Id.*  "If appropriately made, therefore, a request for punitive damages will generally satisfy the amount in controversy requirement because it cannot be stated to a legal certainty that the value of the plaintiff's claim is below the statutory minimum."  *Id.*  The *Golden* court went on to discuss when Pennsylvania law permits punitive damages to be awarded and concluded that it does so for conduct that is outrageous because of the "defendant's evil motive or his reckless indifference to others."  *Id.* at 356, citing *Restatement (2d) Torts §908(2)*.  In other words, as long as the SAC alleges conduct that is at least recklessly tortuous, that should be sufficient to allow for the possibility of punitive damages to be considered in determining whether the diversity amount in controversy threshold has been met.

Safeguard argues that the SAC does not adequately plead a claim for punitive damages, but the Court finds that it does.  Just as a general impression, the basic scenario alleged in the SAC – the unauthorized and unlawful entry into the dwelling of another and the removal of

17

all her personal property – would certainly seem to qualify as something that might be found to support a punitive damage award against the offending parties.  Furthermore, the SAC does include allegations that the conversion was "reckless, in wanton disregard of Carpenter's rights, and was outrageous," while the trespass was done "intentionally," "without her consent," and done without "privilege," "legal justification," or "authority."   SAC at ¶¶35, 39. The SAC also alleges at Paragraph 12 that, before they took the actions complained of, the Defendants had reason to know that the Debtor was residing at the Residence,  which supports an allegation going beyond mere negligence.

Furthermore, Pennsylvania law allows the award of punitive damages in both conversion and trespass claims.  *See*, *Francis J. Bernhardt, III, P.C. v. Needleman*, 705 A.2d 875 (Pa. Super. 1997) (conversion liability provided basis for imposing punitive damages); *Kirkbride v. Lisbon Contractors, Inc.*, 560 A.2d 809 (Pa. Super. 1989) (approving punitive damage award based on a trespass to land).  The Court thus finds that, pursuant to *Golden*, the possibility of punitive damages is not patently frivolous and without foundation in the present case, and that such damages may be considered  when determining whether the amount in controversy requirement has been met.

Considering only the conservative minimum of $28,100 in compensatory damages as discussed above, and the appropriate claim for punitive damages, the Debtor would therefore need to recover $46,900 in punitive damages to meet the amount in controversy threshold.  This is a factor of roughly 1.7 times the compensatory damages, well within the range that other courts in this District have allowed to proceed when faced with similar challenges to the existence of diversity

18

jurisdiction.  For instance, in *Johnson v. State Farm Life Ins. Co.*, 695 F. Supp. 2d 201 (W.D. Pa.

2010) the  plaintiff made a compensatory damage claim of only $10,000 under a whole life policy

issued by the defendant.  The defendant argued that it appeared to a legal certainty that the plaintiff

could not meet the amount in controversy requirement because, even assuming  a 3:1 ratio for

punitive damages,  the amount in controversy would fall well below the $75,000 threshold.  The

court rejected that argument, finding that although punitive damages must be in proportion to

general damages, "it does not necessarily follow that punitive damages should be limited to a 3:1

ratio, particularly given [plaintiff's] allegation in the Complaint that [defendant's] conduct was

outrageous and in bad faith." *Id*. at 207.  It is apparent  that the plaintiff in *Johnson* would have

needed to recover punitive damages of at least $65,000, a ratio of at least 6.5:1, to reach the $75,000

level, yet her case was permitted to proceed.  Similarly, the diversity threshold was found to be met

in *Hamm v. Allstate Prop. & Casualty Ins. Co.*, 2012 WL 5451523 (W.D. Pa. 2012) where

compensatory damages of $22,080 were alleged and the plaintiffs relied upon the possibility of

punitive damages to reach  $75,000, meaning a ratio of at least 2.4:1.

The Court thus finds that a needed ratio of approximately 1.7:1 between punitive and

actual damages in the present case is not unreasonable for purposes of determining whether the

amount in controversy requirement is met.  Furthermore, the Debtor has also alleged other

compensatory damages on top of the ones the Court has considered in arriving at $28,100 as a

conservative minimum amount of compensatory damages.  If any of those other damages were

allowed, it would only serve to increase the compensatory damage "base," further lowering  the

amount and ratio of punitive damages that would need to be recovered to reach the threshold.[12]  To

sum up, the Court finds that it cannot say with legal certainty that the Debtor will be unable to

recover at least $75,000 in this action.  The *Motion* will therefore be denied as to Counts IV and V.


### (5)  Count VI – Malicious Abuse of Process

The Court will deny the *Motion* as to Count VI insofar as it alleges a lack of diversity

subject matter jurisdiction pursuant to *Rule 12(b)(1)*.  The reasons for such denial are spelled out in

the previous discussion under Counts IV and V and will not be repeated in detail here.  The Court

need only note that Pennsylvania law would permit an award of punitive damages if a malicious

abuse of process claim were proven.  *See, Barnett v. Reed*, 51 Pa. 190 (1865) ( in a malicious abuse

of process action, "vindictive" damages may be given when actual malice exists, or a formed design

to injure and oppress).  Thus, the diversity amount in controversy threshold is met as to this claim

as well for the reasons outlined above.


The *Motion* also seeks the dismissal of Count VI pursuant to *Rule 12(b)(6)* for failure

to state a claim upon which relief can be granted.  Safeguard argues that an action for abuse of

---

[12]    It should be noted that the Debtor also seeks attorney fees and she cites a statutory basis for an award of such fees for violation of the automatic stay, pursuant to *11 U.S.C. §362(k)*. *See* SAC at ¶¶19(k), 31.  The Court takes judicial notice that Debtor's counsel recently filed an interim fee application seeking attorney fees of $24,900, the vast majority of which are related to the prosecution of this adversary proceeding.  See Doc. No. 79 in the main case.  Although that application has not yet been granted, it does provide some sense of the potential attorney fees involved.  While the possibility of an award of attorney fees may normally be "counted" in determining the amount in controversy, *Hamm, supra,* the Court will not do so here for a couple of reasons.  First, the only basis for an award of attorney fees stated in the SAC falls under a federal question claim, Count III, and it would seem that the possibility of attorney fees should thus not be counted with respect to the diversity claims.  Second, the debtor has not argued that attorney fees should be counted to reach the diversity threshold.

process[13] requires a plaintiff to demonstrate that the defendant (1) used a legal process against the

plaintiff, (2) primarily to accomplish a purpose for which the process was not designed, and (3) harm

has been caused to the plaintiff.  *See Hart v. O'Malley*, 647 A.2d 542, 551 (Pa. Super. 1994).

According to Safeguard, the Debtor fails to meet these requirements because she has not alleged that

Safeguard used legal process against her in connection with the entry onto the real Property and the

removal of the personalty, and she has not alleged any improper purpose.  Finally, Safeguard notes

that in Paragraph 7b of her Response to the *Motion*, the Debtor admits that Safeguard did not employ

any "legal process" against her and it says that this is a judicial admission.

The Debtor, by contrast, seeks to portray the actions of Safeguard here as part of the

"foreclosure," even though that action was not filed in state court until after the events which are the

subject of the SAC occurred.  The Debtor asserts that the "process" of the foreclosure actually began

in September 2010 when the Bank sent out the Act 6 Notice[14] of its intention to foreclose, and says

---

[13]       The common law tort of abuse of process is to be distinguished from two related torts.  The tort of malicious prosecution concerns the initiation of a criminal proceeding against the plaintiff without probable cause and for a malicious or improper purpose.  The tort of wrongful use of civil proceedings, which has been codified under Pennsylvania law at *42 Pa. C.S.A. §8351* (the Dragonetti Act) concerns the procurement, initiation or continuation of civil proceedings against another with a grossly negligent manner or without probable cause.  Both malicious prosecution and wrongful use of civil proceedings actions require as an element that the underlying proceedings in question have been terminated in favor of the plaintiff. Abuse of process, by contrast, concerns the perversion of a process after it is issued.  *See, e.g., Hart v. O'Malley*, 647 A.2d 542, 551 (Pa. Super. 1994) (action for wrongful use of civil proceedings has to do with wrongful initiation of such process, while abuse of process is improper use of process after it has been issued).  As distinguished from these related torts, abuse of process does not require a showing that the underlying proceeding terminated in the plaintiff's favor, or that there was a lack of probable cause.  *Brown v. Johnston*, 675 F. Supp. 287, 2909-91 (W.D. Pa. 1987).

[14]       A so-called *Act 6 Notice* is required pursuant to 41 P.S. §403 which provides that before a mortgagee may take certain actions regarding a residential mortgage it must provide the debtor notice of such intention at least 30 days in advance.  *Id.* at *§403(a)*.  The notice must be in writing and sent by registered or certified mail.  *Id., §402(b)*.  The notice must contain certain information designed to inform debtors of their rights. *Id., §403(c)*.  A form of the *Act 6 Notice* is found at *10 Pa. Code §7.4.*

that Safeguard was hired by the Bank as part of this process.  The Debtor seeks to characterize the trespass into her Residence and the conversion of her personal property as a perversion of the foreclosure process.  The Debtor admits that Safeguard itself was not a party to any legal proceeding involving her until it was sued in this adversary, but says that a non-party "stranger" to a legal proceeding can be liable for the tort by participating in it, inciting or inducing another to commit a trespass, citing *Shane v. Gulf Ref. Co.*, 173 A. 738 (Pa. Super. 1934) (both constable and judgment creditor found liable for levy improperly made on plaintiff's goods).

The Court finds the argument of Safeguard to be the more persuasive on this point. The only way that Count VI can survive dismissal is if the Debtor can show that a legal proceeding of some kind was in effect and was somehow "used" in conjunction with the improper entry and the taking of the personal property.  It is clear, however,  that no foreclosure action had yet been filed when the entry was made and the property was taken – that did not happen until a week or two later. The only other possible candidate for an existing "process" that the Court has been pointed to is the Act 6 Notice that was sent out by the Bank to the Debtor on September 7, 2010.

For purposes of the abuse of process tort,  the concept of "process" is broadly interpreted under Pennsylvania law, but nevertheless there are  limits to it:

> In Pennsylvania, " '[t]he word process as used in the tort of abuse of process has been interpreted broadly, and encompasses the entire range of procedures incident to the litigation process,' " *Shiner*, 706 A.2d at 1237 (quoting *Rosen*, 627 A.2d at 192), "including discovery proceedings, the noticing of depositions and the issuing of subpoenas." *Pellegrino Food Prods. Co., Inc. v. City of Warren*, 136 F.Supp.2d 391, 407 (W.D.Pa.2000) (citing *Rosen*, 627 A.2d at 192); see also *McGee*, 517 Pa. 247, 535 A.2d 1020 (finding meritless petitions for stay, to open or strike judgment, and other motions sufficient to establish abuse of process); *Shiner*, 706 A.2d at 1237 (finding that petitions for stays in state and bankruptcy courts,

reconsideration of the denial of the stay, an injunction, and to strike a
confessed judgment, as well as challenges before a zoning board, constitute
"use of a legal process" for purposes of an abuse of process claim).

While we agree that some of the alleged uses of legal process,
such as failing to comply with court orders, failing to seek a stay, and
failing to provide copies of subpoenaed documents, as well as contacting
the asbestos litigation counsel, do not  constitute use of a legal process for
purposes of an abuse of process claim, we disagree that the Complaint does
not contain any of the necessary allegations.

*Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 310 (3d Cir. 2003).  *See also*,

*Restatement (2d) Torts, §682*, Reporter's Notes (1977).

As indicated previously, the *Act 6 Notice*  was sent pursuant to the requirements of

*41 P.S. §403*,  which provides in relevant part:

(a) Before any residential mortgage lender may accelerate the
maturity of any residential mortgage obligation, commence any legal action
including mortgage foreclosure to recover under such obligation, or take
possession of any security of the residential mortgage debtor for such
residential mortgage obligation, such person shall give the residential
mortgage debtor notice of such intention at least thirty days in advance as
provided in this section.

*41 P.S. 403(a)*.  A plain reading of this statutory language indicates that the giving of notice is a

precondition of a foreclosure action, but does not of itself commence a foreclosure proceeding.

("Before any residential mortgage lender may ... commence any legal action ...." (emphasis added)).

 *See also, e.g., In re Rodriguez*, 218 B.R. 764 (E.D. Pa. 1998) (describing notice required by this

provision as a "precondition for initiating a foreclosure action or taking any other step toward

obtaining possession of a debtor's residential real estate").  *See also*,  *Pa.R.Civ.P. 1143* (action in

foreclosure is "commenced" by the filing of a complaint).

23

The Court has not been directed to, nor has it found on its own, any case law directly on point deciding whether an Act 6 Notice constitutes "process" under the applicable standard. Somewhat analogous is *Liles v. Am. Corrective Counseling Servs., Inc.*, 131 F. Supp. 2d 1114 (S.D. Iowa 2001) where the court, applying Iowa law, found that a document entitled "Official Notice" that had been sent to the plaintiff by the defendant was not "process" that could support an abuse of process claim. The defendant was a private company that had contracted as an independent contractor with a county prosecutor to run a "bad check restitution program." The Official Notice received by the plaintiff indicated that a "criminal complaint" had been received against her for a dishonored check she had written, indicated a balance due, and stated that criminal prosecution would not be pursued if she paid it within 30 days. The "Official Notice" form included a scale-of-justice emblem and the words "County Attorney Bad Check Restitution Program," but there was nothing on it to indicate it was issued by a court. The *Liles* court granted the defendant's motion to dismiss, finding that, without the involvement of a court in the issuance of the Official Notice, the threat of criminal prosecution was insufficient to constitute "legal process" as required by the tort.

In *Carney v. Rotkin, Schmerin & McIntyre*, 206 Cal. App. 3d 1513, 254 Cal. Rptr. 478 (Cal. App. 2d Dist. 1988) the defendant law firm sent the plaintiff a notice that falsely stated that a court had issued a bench warrant against her, and that it would be enforced unless she made a payment on a judgment by a stated deadline. The court dismissed an abuse of process claim, finding that the mere giving notice of some proceeding is not process for purposes of the tort. The court noted that, in making the false statement, the defendant did not "take any action pursuant to the authority of the court." *Id.*, 254 Cal. Rptr. at 486. In *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 845 F. Supp.1377, 1386 (D. Ariz. 1993) the court held that "pre-process activities"

24

do not meet the requirement to state a claim for abuse of process because "an actual use of suit" is required.

The Court here finds that Count VI must be dismissed for failure to state a claim upon which relief can be granted. There are two reasons for this conclusion. First, and as a matter of first impression as far as it knows, the Court finds that an Act 6 Notice is not "process" for purposes of an abuse of process claim under Pennsylvania law. It is not "incident" to the litigation process, *Gen. Refractories, supra*, it is merely a precondition to invoking the litigation process. No court is involved in the issuance of an Act 6 Notice, nor does the issuance of such notice thereby compel the issuing party to subsequently invoke the litigation process – it may change its mind and not do so. Perhaps the best description of an Act 6 Notice is that of a "pre-process" activity, *Lexecon, supra*, which is an insufficient basis for a claim of abuse of process.

Second, even if the Court were to assume *arguendo* that the Act 6 Notice was process, there is no allegation in the SAC that the Notice was "used" to effect the entry and removal of the property. The Notice had been sent 2-3 months earlier, and there are no allegations that the Defendants used the Notice as a basis or justification for their entry onto the Debtor's Real Property.[15] The second part of the quotation from *Gen. Refractories* as set forth above makes clear that the mere existence of legal process at the time of an alleged offense is not sufficient to state an abuse of process claim; the plaintiff must also show that the process was "used" somehow in the

---

[15]    In fact, the SAC alleges that the day after the entry the Debtor spoke to someone from the Bank and was told that Safeguard and Five Brothers were not supposed to have entered the residence or taken any personal property, only to see if it was occupied. SAC at ¶13. This contention, effectively that of a mistake, is not consistent with the theory that the Defendants were relying on the authority of any legal process to do what they did.

offense.  The Debtor here has failed to do that, and after argument on the matter, it does not appear

that the problem could be corrected by a curative filing.  Therefore, Count VI will be dismissed.

### (6)   Count VII – Invasion of Privacy

Again, for the same reasons as was done with Count VI, the Court will deny the

*Motion* as to Count VII insofar as it alleges a lack of subject matter jurisdiction pursuant to *Rule*

*12(b)(1)*.  The Court will only further note here that  Pennsylvania law would permit an award of

punitive damages if an invasion of privacy  claim were proven.  *See*, *G.J.D. by G.J.D. v. Johnson*,

713 A.2d 1127 (Pa. 1998) (approving punitive damage award on invasion of privacy and intentional

infliction of emotional distress claims).  Thus, the diversity threshold is met as to this claim as well

for the reasons set forth previously.

Safeguard also seeks the dismissal of Count VII under *Rule 12(b)(6)* for failure to

state a claim upon which relief can be granted.  In support of that position, Safeguard makes two

arguments.  First, it argues that there is a one-year statute of limitations for bringing an action for

invasion of privacy, pointing to *42 Pa. C.S.A. §5523(1)*, and noting that the alleged invasion here

occurred in late December 2010 / early January 2011, while Safeguard was not joined as a party to

the action until the SAC was filed on December 26, 2012.  The Debtor acknowledges the one-year

statute for this claim, but points to *11 U.S.C. §108(a)*, which provides that, if applicable

nonbankruptcy law sets a time for commencing an action, and that time has not yet expired when

the petition was filed, then the trustee may commence such action within two years of the order for

relief.  Debtor notes that her petition was filed within the one-year period after the property was

taken, and that Safeguard was added as a party within two years of the petition date.

The Court finds the Debtor to be correct on this question.  Even though *Section 108(a)* is phrased so as to apply only to actions commenced by the "trustee," that  has been construed in the Chapter 13 context to include actions brought by the debtor.  *See*, *In re McConnell*, 390 B.R. 170 (Bankr. W.D. Pa. 2008) where the court  concluded that a Chapter 13 debtor should also get the benefit of the two year extension as provided in *Section 108(a)* because the debtor was essentially acting the same as a Chapter 11 debtor-in-possession (who expressly has the powers of a trustee under *11 U.S.C. §1107(a)*) by virtue of *11 USC §1306(b)*.  The Court agrees with that conclusion and adopts it here.  Count VII is thus not barred by the statute of limitations.

The second reason advanced by Safeguard for dismissing  Count VII under *Rule 12(b)(6)* is that it fails to  allege facts sufficient to establish an "intentional intrusion on the seclusion of the plaintiff's private concerns which was substantial and highly offensive to a reasonable person," citing *Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.,* 809 A.2d 243 (Pa. 2002). Safeguard relies on  several cases which it says establish that what is alleged to have happened here cannot meet that standard.

The cases relied upon by Safeguard are, however,  factually quite distinct  from what happened here.  In *Boring v. Google,* 362 Fed. App. 273 (3d Cir. 2010) the defendant took pictures of the plaintiff's property, which was on a private road, for use on the internet Google "Street View" program.  The only actual "intrusion" that occurred was that the truck taking the photographs pulled into the plaintiff's driveway, and the court found that no reasonable person of ordinary sensibilities could be shamed, humiliated, or have suffered mentally as a result of that.  In *Pacitti v. Durr*, 2008 WL 793875 (W.D. Pa. 2008), affirmed 310 Fed. App. 526 (3d Cir. 2010) the court found it

27

inconceivable for a reasonable fact finder to conclude that an entry into a condominium unit at a

time when the unit was under construction, coupled with the engagement in a short conversation

about the nature of the renovations going on, could be "highly offensive."

The Debtor argues that she had a reasonable expectation of privacy in the interior of

her home, and states that her pictures, letters, memorabilia, etc. that were taken and never returned

can be accurately characterized as part of her private affairs. She notes that the only case cited by

Safeguard involving the intrusion into the *interior* of a residence, *Pacitti*, involved a unit that was

under construction, and that the resulting intrusion consisted only of a brief conversation.

The tort of invasion of privacy – intentional intrusion upon seclusion, is exposited

in *Restatement(2d) Torts §652B* (1977), which states the general rule that one who intentionally

intrudes upon the solitude or seclusion of another or his private affairs or concerns is subject to

liability if the intrusion would be highly offensive to a reasonable person. Among the cases cited

in support of that general rule is one that closely parallels what happened in the present matter.

In *Ford Motor Co. v. Williams*, 132 S.E. 2d 206 (Ga. Ct. App. 1963), reversed on

other grounds by 134 S.E. 2d 32 (Ga. 1963) an agent acting on behalf of Ford entered the plaintiff's

home when no one was there and removed personal property belonging to her. The court found that

though this action would constitute a trespass, it could also constitute an invasion of privacy. The

court reached that conclusion even though the plaintiff was not present at the time of the entry (just

as the Debtor in the instant case was not).

Another instructive case is *Robison v. Litton Loan Servicing, L.P.* 2011 WL 1135369

(D. Colo. 2011), where a mortgage servicer and its agents were alleged, *inter alia*, to have invaded

the privacy of the plaintiff by entering her house while she was absent from it to "winterize" it and

change the locks.  The plaintiff alleged that she was eventually given the access code so she could

get into the house,  and when she did she discovered that several items were missing.  The

defendants moved for summary judgment as to all claims.  The court denied summary judgment on

the invasion of privacy claim because there were factual issues going to a consent defense raised by

the defendants based on language in a deed of trust.  The court went on to say that even if consent

were shown, issues of fact would remain as to whether the defendant's conduct was reasonable and

appropriate under the circumstances.  Thus, by implication, the *Robison* court found that an entry

into the premises of another can constitute an invasion of privacy.  *See also*, D. Elder, *Privacy Torts*

§2.5 at fn. 26 (2012) (collecting cases in which physical intrusions destroying the "privacy and

sanctity" of the home have been the basis for invasion of privacy claims).

Taking the allegations in the SAC as true, the Court finds that a person of ordinary

sensibilities could have been highly offended, shamed, humiliated or suffered emotionally from

having her residence entered unlawfully and all the contents thereof, including those of the most

private nature, removed without her knowledge or consent.  The Court additionally finds that such

person could be highly offended, etc., even if she was not present at the time of the entry and

removal.  The allegations of Count VII are therefore sufficient to withstand a motion to dismiss.

### *(7)   Count VIII – Intentional Infliction of Emotional Distress*

The Court will deny the *Rule 12(b)(1)* motion to dismiss Count VIII for lack of

subject matter jurisdiction for the reasons previously stated.  In addition to that, Safeguard seeks the

dismissal of Count VIII under *Rule 12(b)(6)* for failure to state a claim upon which relief can be granted.  Safeguard raises two arguments in that regard.  First, it argues that the facts as alleged by the Debtor are not sufficiently "outrageous" to support an intentional infliction of emotional distress ("IIED") claim.  Second, it argues that the Debtor has failed to argue any resulting physical harm, which it says is a *sine qua non* of an IIED claim.

The Pennsylvania Supreme Court has not expressly recognized a cause of action for IIED, however it has discussed such claim and what elements would need to be shown by a plaintiff, assuming the cause of action were to be formally recognized. *See*, *Reedy v. Evanson*, 615 F.3d 197, 231-32 (3d Cir. 2010) (discussing Pennsylvania case law on IIED).  Despite this lack of formal recognition by the Pennsylvania Supreme Court, federal courts in Pennsylvania have generally proceeded under the assumption that IIED is a potential common law tort claim under the law of this Commonwealth, and the Court will do likewise here.

In order for the Debtor to prevail on an IIED claim,  she must demonstrate intentional, outrageous or extreme conduct by the Defendants that caused her severe emotional distress.  The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Field v. Phila. Elec. Co.*, 565 A.2d 1170 (Pa. Super. 1989)).

Perhaps to guard against a perceived potential for abuse inherent in an IIED claim, the courts have imposed a very demanding standard before such claim is allowed.  As one court stated:

30

> "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." ... "[C]ourts have been chary to allow recovery for a claim of intentional infliction of emotional distress." ... It is "not [ ] enough that the defendant has acted with intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that this conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." ... The tort is instead "reserved by the courts for only the most clearly desperate and ultra extreme conduct."

*Messer v. First Fin. Fed. Credit Union of Md.*, 2012 WL 3104604 *3 (E.D. Pa. 2012) (footnotes and citations omitted). Under Pennsylvania law, it is for the Court to determine in the first instance whether a defendant's conduct can be reasonably regarded as so extreme and outrageous as to permit recovery. *Id. See also, Corbett v. Morgenstern*, 934 F. Supp. 680, 684 (E.D. Pa. 1996).

The *Messer* court noted that a number of courts, both federal and state, have suggested that activities associated with a residential foreclosure might, in egregious circumstances, support an IIED claim under Pennsylvania law. *See, Messer*, 2012 WL 3104064 *3, cases cited in fn. 27. None of the cases cited, however, ultimately allowed an IIED claim under the facts presented.[16] In *Messer* itself, the allegations were that the defendant had repossessed and sold the plaintiff's car without legal justification, sent her a single notification letter informing her of the repossession and redemption policy, and thereafter fabricating loan documents to support the repossession. The court found that such actions were possibly fraudulent, and certainly disgraceful, but not sufficiently extreme and outrageous as to support an IIED claim.

---

[16]     Among the circumstances addressed in the cases cited by the *Messer* court were false representations that a judgment had been obtained against a debtor, sending a notice of intention to foreclose when there was no right to foreclose, threatening immediate foreclosure while knowing that foreclosure could not occur without a hearing, untrue statements that a debtor's account were past due as a result of delinquent payments, and a false listing of a plaintiff as a mortgagor in a sheriff sale advertisement.

The allegations in the present case certainly go beyond what happened in *Messer*, or any of the cases cited therein where the theoretical possibility of an IIED claim in connection with foreclosure activity was recognized. The analogy of the home as "castle" is a longstanding one in Anglo-American jurisprudence, and perhaps calls for special sensitivity when allegations are made going to an invasion of the home. The Court finds that, for purposes of the *Motion*, and based on the facts as framed in the SAC, it is at least plausible that a reasonable jury could conclude that the activities attributed to the Defendants in unlawfully entering the Debtor's residence and removing all of her personal property was sufficiently outrageous to support a liability under an IIED claim. *See, e.g., Corr. Med. Care, Inc., v. Gray*, 2008 WL 248977 *13 (E.D. Pa. 2008) (denying motion to dismiss IIED claim because complaint alleges activities, one of which was multiple trespasses of the home, that might give rise to liability).

Even though Count VIII pleads sufficiently outrageous facts to state a claim against the defendants for IIED, it founders on another required element of the tort, *i.e.*, that Debtor must plead and prove some resulting manifestation of injury accompanying the alleged distress. The Debtor herself acknowledges that the SAC does not contain any such allegations. She says, however, that if necessary she can further amend her complaint to allege that she has suffered headaches, loss of appetite, insomnia and depression following the events at her Real Property. If the mere lack of allegation of an injury were the only impediment to the continued existence of the IIED claim, the Court would grant the Debtor leave to file a further amendment. *See*, *Connelly v. Steel Valley School Dist.*, 706 F.3d 209, 217 (3d Cir. January 24, 2013) (if a complaint is vulnerable to a dismissal under *Rule 12(b)(6)*, the court must permit a curative amendment unless an

amendment would be inequitable or futile). But there is more to it than that; the Debtor also has a

medical proof problem that cannot be ignored.

In *Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988 (Pa. 1987), a leading

Pennsylvania Supreme Court case discussing IIED, the court stated:

> It is basic to tort law that an injury is an element to be proven. Given the
> advanced state of medical science, it is unwise and unnecessary to permit recovery to
> be predicated on an inference based on the defendant's "outrageousness" without
> expert medical confirmation that the plaintiff actually suffered the claimed distress.
> Moreover, the requirement of some objective proof of severe emotional distress will
> not present an unsurmountable obstacle to recovery. Those truly damaged should have
> little difficulty in procuring reliable testimony as to the nature and extent of their
> injuries. We therefore conclude that if section 46 of the Restatement is to be accepted
> in this Commonwealth, at the very least, existence of the alleged emotional distress
> must be supported by competent medical evidence. In this case no such evidence was
> presented and the record further reflects that neither Mr. nor Mrs. Kazatsky sought
> medical assistance.

*Id.* at 995. Thus, the Debtor would not only have to allege that she suffered harm as a result of the

Defendants' actions, she would also have to provide medical proof to establish the harm and link

it to the Defendants' actions. At the oral argument on the *Motion*, however, Debtor's attorney

conceded that she never sought medical treatment for any of the consequences she is prepared to

allege in a further amendment of her complaint, nor does she have a medical expert at this time who

will provide the necessary medical testimony. Any permission for a further amendment to allege

harm would therefor be futile given the present circumstances.

The Court is therefore prepared to dismiss Count VIII for failure to state a claim. In

recognition that, however unlikely, it might still be possible for the Debtor to secure the necessary

medical proof, the Court will not make such dismissal effective for a period of thirty days. If, in the

meantime, the Debtor supplies the Court and opposing counsel with a medical expert report

confirming the existence of a medically recognized injury as a result of Safeguard's alleged actions

in this regard and  files a motion seeking leave to further amend her complaint to allege  harm in

Count VIII based on this expert medical opinion, the Court will stay that dismissal while such

motion is considered.


## CONCLUSION


For all of the foregoing reasons, the *Motion* will be **GRANTED** in part and **DENIED**

in part.  An appropriate Order follows this *Opinion*.


Dated: May 7, 2013

_____
Thomas P. Agresti, Chief Judge
United States Bankruptcy Court


Case administrator to serve:
    Gary W. Short, Esq.
    Debtor
    Scott M. Hare, Esq.
    George A. Miller, Esq.
    Joseph J. Santoro, Esq.                                    :